IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DANIEL J. SHERMAN, in his capacity        §
as Chapter 7 Trustee, and on behalf of the  §
Estate of HEREFORD BIOFUELS, L.P.,         §
                                            §
        Plaintiff,                          §
                                            §
v.                                          §        Civil Action No. 3:11-CV-0710-N
                                            §
GREENSTONE FARM CREDIT                      §
SERVICES, ACA, *et al.*,                    §
                                            §
        Defendants.                         §

## ORDER

This Order addresses Bankruptcy Judge Stacey G. C. Jernigan's *sua sponte* report and

recommendation (the "Report and Recommendation) to the Court concerning this adversary

proceeding involving "noncore" matters related to Hereford Biofuels, L.P.'s, Chapter 7

bankruptcy [2]. *See In re Hereford Biofuels, L.P.*, No. 09-30453-SGJ-7 (Bankr. N.D. Tex.

filed Jan 23, 2009); *Sherman v. Greenstone Farm Credit Services, ACA*, Adversary No. 09-

03044-SGJ (Bankr. N.D. Tex. removed Feb. 6, 2009). For the reasons detailed in Judge

Jernigan's memorandum opinion and order below, the Court withdraws the reference in this

case and adopts as the Order of this Court Judge Jernigan's proposed order granting summary

judgment in the Defendants' favor, as modified.

As Judge Jernigan notes in her *sua sponte* report, this case comes to the Court "in a slightly unusual procedural context." Report and Recommendation at 2. The Court incorporates the factual background of this case contained Judge Jernigan's report and reproduces it here as modified.

> [This] Action involves claims by a borrower (*i.e.*, a Chapter 7 bankruptcy trustee for a now-bankrupt borrower) that a lender who entered into a pre-bankruptcy financing agreement with the borrower committed breach of contract by failing to fund certain borrowing requests made by the borrower. The bankruptcy court has determined that it has bankruptcy subject matter in the Action, pursuant to 28 U.S.C. § 1334(b), as the proceeding is "related to" a bankruptcy case, but that "non-core" matters are involved in the Action, as contemplated by 28 U.S.C. §§ 157(b) & 1334(b).
>
> The Action was initially commenced in the 192nd Judicial District Court of Dallas County, Texas (the "State Court") by the borrower and original plaintiff, Panda Hereford Ethanol, L.P. ("Panda-Hereford"), against Defendants Greenstone Farm Credit Services, ACA and Greenstone Farm Credit Services, FLCA (collectively, "Defendant"), on December 19, 2008. The Action was soon removed to the bankruptcy court in Dallas (on February 6, 2009), after [Panda-Hereford] filed for bankruptcy in Dallas on January 23, 2009. By virtue of Miscellaneous Order No. 33 Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (the "Northern District of Texas Standing Order of Reference"), dated August 3, 1984, and pursuant to 28 U.S.C. § 157, the bankruptcy court has exercised jurisdiction since removal of the Action.
>
> On September 22, 2009, the bankruptcy case was converted to Chapter 7, and Daniel J. Sherman was appointed as the chapter 7 Trustee (the "Trustee"). On December 21, 2009, the Trustee was substituted into the Action for Panda-Hereford and is now the Plaintiff.
>
> . . . . ***The Plaintiff (both when it was Panda-Hereford, and then after the Chapter 7 Trustee substituted in) has always agreed to the bankruptcy court entering final orders in the Action. However, the Defendant has not agreed to the bankruptcy court entering final orders.*** Neither party has ever filed a timely motion asking the district court to withdraw the reference. 28 U.S.C. § 157(c) & (d). This creates the "slightly unusual procedural context"

of this Action . . . . Although no party has requested that the district court withdraw the reference in this case, where a bankruptcy court determines that it is necessary, a *sua sponte* report and recommendation is appropriate. *See, e.g.*, *Walsh v. Brush (In re Walsh)*, 79 B.R. 28 (D. Nev. 1987).

To summarize, the bankruptcy court has had authority, since its removal, to **hear** the above-referenced Action involving "non-core" matters that are "related to" the Panda-Hereford bankruptcy case. However, it cannot enter final orders in the Action because of the lack of consent by the Defendant (rather, the bankruptcy court must merely submit any proposed findings or conclusions to the district court for it to enter any final order or judgment). *See* 28 U.S.C. § 157(c)(1).

Fast-forwarding to the present, the bankruptcy court has recently heard cross motions for summary judgment in the Action and has decided it is appropriate to grant the Defendant's motion for summary judgment. Since the bankruptcy court's decision . . . would result in a full and final judgment disposing of the Action, the bankruptcy court hereby submits [a proposed] ruling to the district court, as necessitated by 28 U.S.C. § 157(c)(1), asking the district court to now: (a) withdraw the reference in the Action for purposes of considering the bankruptcy court's proposed Memorandum Opinion and Order . . . ; and (b) either enter or decline the [proposed] . . . Order, as deemed appropriate.

Report and Recommendation at 2-5 (emphasis in original).

The Court now adopts the findings, conclusions, and recommendations contained in Judge Jernigan's proposed memorandum opinion and order. The Court reproduces that ruling below, as modified.[1] Docket entries referenced below relate to entries for the bankruptcy proceedings.

_____

[1]The Court's modifications consist almost exclusively of aesthetic formatting changes, such as changes in font type, size, and spacing. The Court, however, did omit proposed footnote three. The Court has also modified language to reflect the Order is now this Court's Order, rather than a recommendation of the bankruptcy court.

## II. MEMORANDUM OPINION AND ORDER

CAME ON FOR CONSIDERATION by the Court: (1) the Motion for Summary Judgment and Brief in Support [DE # 53] (the "Defendant's MSJ"), filed by Defendants Greenstone Farm Credit Services, ACA and Greenstone Farm Credit Services, FLCA (who will collectively hereinafter be referred to as "Defendant" or "Greenstone"); the Response thereto [DE #57], filed by the Plaintiff, Daniel J. Sherman, Chapter 7 Trustee, on behalf of the Estate of Hereford Biofuels, L.P. f/k/a Panda Hereford Ethanol, L.P. (the "Plaintiff"); the Reply thereto [DE # 59] of the Defendant; (2) the Plaintiff's Motion for Partial Summary Judgment and Brief in Support [DE ## 55 & 56] (the "Plaintiff's MSJ"); the Response thereto [DE # 61] of the Defendant; and (3) all summary judgment evidence/appendices submitted with such pleadings.[2]  Based upon the summary judgment record and arguments presented in the pleadings, the Court rules as follows:

## I. INTRODUCTION

The above-referenced adversary proceeding (the "Action") involves an allegation by a borrower (*i.e.,* a bankruptcy trustee for a now-bankrupt borrower) that one of its prospective lenders, who was party to a multi-lender financing agreement, committed breach

---

[2]During the hearing on these matters, the bankruptcy court also considered the Plaintiff's Objection to Defendant's Supplemental Evidence Offered in Defendant's Reply Brief in Support of Defendant's MSJ [DE # 64] (the "Objection"), along with Defendant's Response to the Objection [DE # 66].  In a subsequent Order [DE # 68], the bankruptcy court partially sustained the Objection.  Specifically, the bankruptcy court sustained the Plaintiff's "best evidence" objection with respect to Paragraph 4 of the Second Affidavit of Albert S. Compton, Jr.  The Objection was otherwise overruled.

of contract by failing to fund said lender's *pro rata* share of certain borrowing requests made by the borrower.

The Action was initially commenced in state court in Dallas, Texas, but was removed to the bankruptcy court in Dallas, when the original plaintiff and borrower, Panda Hereford Ethanol, L.P. ("Panda-Hereford"[3] or the "Debtor"), filed for bankruptcy in Dallas. Panda-Hereford resorted to filing bankruptcy when it did not have the necessary funds to finish construction on what was intended to be a state-of-the art, manure-fueled ethanol plant in Hereford, Texas. According to pleadings filed in Panda-Hereford's bankruptcy case, $225 million had been invested in the ethanol plant at the time of the filing of the bankruptcy case ($80 million of which was equity).[4]

The central characters relevant in this Action are: (a) Daniel Sherman, who is the Chapter 7 Trustee for Panda-Hereford (who is now the Plaintiff in this Action, taking the place of the defunct Panda-Hereford); (b) a Senior, Secured Lender Group (herein so called, or sometimes referred to collectively as the "Lenders"),[5] of which Société Générale, a bank organized and existing under the laws of France, and acting through its New York Branch,

---

[3]The term "Panda-Hereford" will also be used when referring to Hereford Biofuels, L.P. f/k/a Panda Hereford Biofuels, L.P. f/k/a Panda Hereford Ethanol, L.P.

[4]The ethanol plant has since been sold in a bankruptcy auction to Panda-Hereford's primary lender, whose stated intention was to "moth ball" the more-than-90% completed facility for some indefinite time period (presumably until ethanol plants are – or at least this one is – a more viable, attractive energy option – whenever that may be).

[5]The Court will use the defined term "Lender" when referring to any one member of the Senior, Secured Lender Group individually.

served as Administrative Agent, Disbursement Agent, Collateral Agent and L.C. Fronting Bank, and of which SG Americas Securities, LLC, served as Lead Arranger; and (c) Greenstone, the Defendant herein – who was but one member of the Senior, Secured Lender Group, and is the only member being sued in this Action. The Senior, Secured Lender Group originally consisted of five Lenders, who agreed to loan many millions of dollars to Panda-Hereford on a secured basis, under certain terms and conditions – and in two tranches – with such loans to be secured by first priority liens in substantially all of the assets of Panda-Hereford.

As alluded to, Greenstone is being sued for its ultimate refusal to fund its portion of two draw requests from Panda-Hereford, when asked.

## II. JURISDICTION AND PROCEDURAL POSTURE

This Court has bankruptcy subject matter jurisdiction in this Action, pursuant to 28 U.S.C. § 1334(b). However, the Action involves non-core, "related to" matters, pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). ***The Plaintiff has agreed to the bankruptcy court entering final orders, but the Defendant has not***. Neither party has filed a timely motion asking the Court to withdraw the reference. Thus, the bankruptcy court has authority to hear the Action, but cannot enter final orders in it (but, rather, must submit any proposed findings or conclusions to the Court for it to enter any final order or judgment). *See* 28 U.S.C. § 157(c)(1). Since this proposed ruling of the bankruptcy court concludes that ***summary judgment in favor of Defendant*** is appropriate, which would result in a full and final

judgment disposing of the Action, the bankruptcy court has submitted the below ruling to this

Court to enter or decline pursuant to 28 U.S.C. § 157(c)(1).

III. UNDISPUTED MATERIAL FACTS[6]

A.   *The Relevant Loan Documents Between Panda-Hereford and its Senior, Secured Lender Group*

1.   The parties submitted a lengthy Stipulation of Agreed Facts (the "Stipulation"),

which included the following loan documents:

> (1) a Financing Agreement, dated as of July 28, 2006, by and among Panda-Hereford, as Borrower, The Lenders Named on the Signature Pages to [the] Agreement, as Lenders, Société Générale, as Administrative Agent, Disbursement Agent, Collateral Agent and L.C. Fronting Bank and SG Americas Securities, LLC, as Lead Arranger (the "Financing Agreement") (Defendant's App. 5-197);

> (2) a Depository and Disbursement Agreement, dated as of July 28, 2006, by and between Panda-Hereford, as Borrower, and Société Générale, as Administrative Agent and Disbursement Agent (the "Depository and Disbursement Agreement") (Defendant's App. 198-243);

> (3) a First Amendment to Financing Agreement and Depository and Disbursement Agreement, dated June 15, 2007, by and among Panda-Hereford, as Borrower, Société Générale, as Administrative Agent, Disbursement Agent and a Lender, and the Lenders (the "First Amendment") (Defendant's App. 244-279);

---

[6]The Court herein refers to the summary judgment evidence contained in the Appendix to the Defendant's MSJ as the "Defendant's App.__" with the applicable page numbers used at the "___." The Defendant also filed a second Appendix, and the Court refers to the summary judgment contained in the second Appendix as "Defendant's App. II __" with the applicable page numbers used at the "__." The Plaintiff did not file a separate appendix in support of the Plaintiff's MSJ. Note that, in determining the merits of the Plaintiff's MSJ and the Defendant's MSJ, the Court also has discretion to take judicial notice of all documents filed in the Action. *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).

(4) a Second Amendment to Financing Agreement and Depository and Disbursement Agreement, dated as of April 2, 2008, by and among Panda-Hereford, as Borrower, Société Générale, as Administrative Agent, Disbursement Agent and a Lender, and the Lenders (the "Second Amendment") (Defendant's App. 280-317);

(5) a Waiver to Depository and Disbursement Agreement, dated as of September 5, 2008, by and among Panda-Hereford, as Borrower, Société Générale, as Administrative Agent, Disbursement Agent and a Lender and the Lenders (Defendant's App. 318-342);

(6) a Waiver to Financing Agreement and Depository and Disbursement Agreement, dated as of October 6, 2008, by and among Panda-Hereford, as Borrower, Société Générale, as Administrative Agent, Disbursement Agent and a Lender, and the party hereto (Defendant's App. 343-370)

(collectively, the "Loan Documents" or "Financing Documents"). *See* Defendant's App. 1-370.

### i. The Details of the Financing Agreement

2.  On July 28, 2006, Panda-Hereford and the Senior, Secured Lender Group, originally inclusive of five Lenders, each executed the Financing Agreement.

3.  The Financing Agreement set forth the terms and conditions applicable to certain loans that would be made by the members of the Senior Secured Lender Group for the construction of Panda-Hereford's ethanol production facility in Hereford, Texas. The Financing Agreement was intended to provide Panda-Hereford with term loans totaling $101,647,945.00, a working capital loan of $5,000,000.00, and certain so-called "LC Borrowings" which totaled $51,452,055.00, for a total loan package of $158,100,000.00. *See* Defendant's App. 95.

4. The most significant part of the loan package – the term loans – were to be disbursed in two tranches: Tranche A and Tranche B. Tranche A consisted of loan commitments totaling $63,100,000. Tranche B consisted of loan commitments totaling $38,547,945.00.

5. Société Générale (in addition to being the Agent Bank on the Financing Agreement) was the primary committed Lender under the Financing Agreement. On the term loans, Société Générale assumed 100% of the Tranche A commitment and 14.66% of the Tranche B commitment.[7] *See* Defendant's App. 89. As for the Tranche B commitments, these originally were to come from four different Lenders besides Société Générale: (a) Banco Bilbao Vizcaya Argentaria S.A., with a 43.06% commitment; (b) Caja de Ahorros del Mediterraneo, with a 10.99% commitment; (c) KfW, with an 18.32% commitment; and (d) the Defendant, Greenstone, with a 12.97% commitment. *See* Defendant's App. 90-93. Note that the Defendant was ***not*** a committed Lender on Tranche A; nor was it committed on any of the working capital loan or LC. *See* Defendant's App. 95, 125, 89-93.

6. The Tranche A commitment was to be deposited into Panda-Hereford's construction account ***at the outset of the loan*** (specifically, on the "Term Loan Funding Date"). *See* Defendant's App. 11.

7. After the Tranche A funds were advanced, the Tranche B loans were to be made available to Panda-Hereford ***in specific draws (or, really, requests)*** based upon the amounts

---

[7]Société Générale also assumed 100% of the working capital loan commitment and 27.89% of the LC commitment. *See* Defendant's App. 89.

requested in formal borrowing notices, which were prepared and periodically presented by Panda-Hereford to the Administrative Agent, Société Générale. *Id.* *See also* Defendant's App. 145-46.

8.  Under Section 2.2(b) of the Financing Agreement, each Tranche B Lender was expected to fund its share of each draw requested based upon its *pro rata* share of the entire Tranche B Commitment. *See* Defendant's App. 11.

9.  Under the Financing Agreement, the Defendant's overall funding obligation was anticipated to be approximately $5,000,000.00 (12.97% times the Tranche B term loan of $38,547,945). *See* Defendant's App. 92.

10.  As earlier mentioned, Société Générale served as the Administrative Agent for all of the Lenders under the Financing Agreement. The Financing Agreement provided that the Administrative Agent was to act for all of the Lenders in handling the day-to-day administrative aspects of the loan transaction. *See* Defendant's App. 74-75. In certain matters, however, the Administrative Agent could only take actions upon the instructions of the "Majority Lenders."[8] In yet other matters, full consent of ***all***  Lenders was required.

11.  Especially relevant to this Action is Section 8.5 of the Financing Agreement, addressing "Amendments and Waivers" to provisions of the Financing Agreement. As a general matter, Section 8.5 required that amendments and waivers be in writing and signed

---

[8]The Financing Agreement defined "Majority Lenders" as "the holders of at least fifty-one percent (51%) in principal amount of the Notes then outstanding . . . or, if no Notes are then outstanding, Lenders having at least fifty-one percent (51%) of the Commitments." *See* Defendant's App. 114.

by the Administrative Agent with the consent of ***the Majority Lenders***.  However, there is a specific proviso in Section 8.5, with regard to any amendment or waiver "that could ***reasonably be expected*** to affect the principal amount, amortization or maturity of, the interest rate applicable to . . . the Loans": any such amendment or waiver would not "be effective without the consent of ***all*** of the Lenders."  *See* Defendant's App. 79 (emphasis added).[9]

### *ii. The September 4th Draw Request and the September 5th Waiver*

12.  Panda-Hereford presented its first draw request under Tranche B on September 4, 2008 (the "September 4th Draw Request") in the amount of $136,633.11.[10]  *See* Defendant's App. 318, 321, and 348.

---

[9]Section 8.5 of the Financing Agreement provided, in full, as follows:

> Section 8.5  <u>Amendments and Waivers</u>.  No amendment or waiver of any provision of any Financing Document, or consent to any departure by Borrower therefrom, will be effective unless it is in writing and signed by the Administrative Agent with the consent of the Majority Lenders; <u>provided</u>, that no such amendment, waiver or consent that could reasonably be expected to affect the principal amount, amortization or maturity of, the interest rate applicable to, or the Collateral securing, the Loans and the LC Borrowings will be effective without the consent of all the Lenders.  A waiver or consent granted pursuant to this Section 8.5 will be effective only in the specific instance and for the specific purpose for which it is given.

[10]At the time the September 4th Draw Request was made, Tranche A had been fully funded (*i.e.,* $63,100,000 in loan disbursements under Tranche A had been made).  *See* Defendant's App. 321.

13.  At the time of the September 4th Draw Request,[11] it is undisputed that Panda-Hereford was unable to satisfy all of the conditions precedent to an advance of funds, as set forth in Section 3.5 of the Financing Agreement and described in Section 1.2(c) of the Depository and Disbursement Agreement.[12]  *See* Defendant's App. 3.

14.  Although Panda-Hereford was in default under the Financing Agreement and, thus, could not satisfy all conditions precedent to an advance of funds, Société Générale and certain other Tranche B Lenders (not including the Defendant) – specifically, a group that constituted the "Majority Lenders" – agreed to waive Panda-Hereford's defaults and fund their *pro rata* share of the September 4th Draw Request, pursuant to the execution of the September 5th Waiver.

---

[11]Note that all Defendant's Appendix references herein, when discussing draw requests made by Panda-Hereford, are actually references to certain waivers given by the Majority Lenders to Panda-Hereford (*i.e.,* the September 5th Waiver and the October 6th Waiver) that happen to ***mention*** the draw requests.  Panda-Hereford's September 4th Draw Request and November 21st Draw Request (later herein discussed), ***oddly, were not submitted as part of the summary judgment evidence***.  Only the forms for draw requests (contemplated by the Financing Agreement) were submitted as part of the summary judgment evidence.  *See* Defendant's App. 145 & 229.  Be that as it may, it is undisputed that Panda-Hereford made draw/borrowing requests for Tranche B funds on September 4, 2008 and November 21, 2008.

[12]Section 3.5 of the Financing Agreement is entitled "Conditions Precedent to each Funding Date" and states that the obligation of the Lenders to disburse loan funds is subject to the satisfaction of certain specific conditions, including that no default has occurred and is continuing.  *See* Defendant's App. 40-41.

Section 1.2(c)(iv) of the Depository and Disbursement Agreement provides that "prior to any withdrawals from any Construction Account, the following conditions shall have been satisfied . . . (iv) All certifications in the Construction Draw Request shall be true and accurate and, if a Funding Date, all applicable conditions precedent to such Funding Date, as set forth in Article III of the Financing Agreement, shall have been satisfied."  *See* Defendant's App. 199.

15. To be clear, the September 5th Waiver was signed by the Administrative Agent, Société Générale, and by the ***Majority Lenders***, but it was not signed by the Defendant. *Id.*

16. The September 5th Waiver states that in order to induce the "undersigned Lenders" to sign off on the September 5th Waiver, Panda-Hereford agreed that the "Applicable Margin" (*i.e.*, the interest rate) would be increased to 4.25% when the September 5th Waiver became effective.[13] *See* Defendant's App. 319. The Majority Lenders signing the September 5th Waiver also received a waiver fee (equal to 0.5% of the outstanding commitments of the Lenders who executed the September 5th Waiver) out of the funds disbursed to Panda-Hereford. *See* Defendant's App. 319. In the case of the September 5th Waiver, this amounted to a $565,500.00 aggregate waiver fee, out of which $125,000 was paid to Société Générale. *See* Defendant's App. 382-84. There is no evidence that Greenstone received any portion of the waiver fee – and, indeed, it should not have, because it was not an "undersigned Lender" on the September 5th Waiver.[14]

17. Although Section 8.5 of the Financing Agreement, on the one hand, states that an amendment or waiver is effective if it is "in writing signed by the Administrative Agent

---

[13]Section 2.3(a) of the Financing Agreement provides that the interest rates paid on each Loan and LC Borrowing will be based on the sum of the Applicable Margin plus either (I) LIBOR for Eurodollar Loans and Eurodollar LC Borrowings or (II) the Base Rate for Base Rate Loans and Base Rate LC Borrowings. *See* Defendant's App. 16-17. Under schedule X to the Financing Agreement, the Applicable Margin was initially set at 3.75% from and after the Closing Date and 3.5% after the Completion Date. *See* Defendant's App. 95.

[14]Note that Greenstone ***did*** receive ***commitment*** fees associated with the Financing Agreement – which commitment fees the Plaintiff has sought to recover in this Action.

with the consent of the 'Majority Lenders'," it also provides that "an amendment, waiver, or consent that could ***reasonably be expected*** to affect the principal amount, amortization or maturity of, the interest rate applicable to, or the Collateral securing, the Loans and the LC Borrowings will [not] be effective without the consent of ***all*** the Lenders." *See* Defendant's App. 79 (emphasis added).

18. In September of 2008, Société Générale demanded that Greenstone fund its proportionate share of the September 4th Draw Request ($17,722.49). Greenstone refused to do so, based upon the failure of Panda-Hereford to comply with the requirements of Section 3.5 of the Financing Agreement and Section 1.2(c) of the Depository and Disbursement Agreement. *See* Defendant's App. 3, 371. Notably, although the Defendant refused to fund its *pro rata* share of the September 4th Draw Request, Panda-Hereford still received all of the funds it requested due to Société Générale electing to advance the Defendant's share of the draw request and then repay itself out of a later advance. *See* Defendant's App. 380.

### *iii. The October 6th Waiver and the November 21st Draw Request*

19. Approximately one month later, Société Générale, as Administrative Agent, and the Majority Lenders entered into yet another agreement with Panda-Hereford under which certain defaults by Panda-Hereford were waived until January 30, 2009, in order to allow Panda-Hereford to receive additional loan proceeds. Specifically, under the terms of the October 6th Waiver, Panda-Hereford was permitted to borrow an additional $2.5 million from a subordinate lender. *See* Defendant's App. 344. Furthermore, "as an inducement to

the Majority Lenders to execute this waiver, Panda-Hereford agreed that the Applicable Margin would be increased to 5.75% on the effective date of the Waiver." *See* Defendant's App. 344-45. Finally, each of the Lenders signing the October 6th Waiver received an additional waiver fee (equal to 0.5% of the outstanding commitments of the Lenders who executed the October 6th Waiver) to be paid out of the funds advanced to Panda-Hereford. *See* Defendant's App. 345. The Defendant did not execute the October 6th Waiver. *See* Defendant's App. 3. As with the September 5th Waiver, there is once again no evidence that Greenstone received any portion of the waiver fee associated with the October 6th Waiver – and, indeed, it should not have, since it was not an "undersigned Lender" on the October 6th Waiver.

20. On November 21, 2008, Panda-Hereford made another draw request under Tranche B (the "November 21st Draw Request") in the amount of $1,997,138.97. *See* Defendant's App. 372, Defendant's App. II 9, & DE # 39, paragraph 17. Société Générale again demanded that Greenstone fund its proportionate share of the November 21st Draw Request ($259,046.10), but Greenstone refused to do so, based upon the failure of Panda-Hereford to comply with the requirements of Section 3.5 of the Financing Agreement and Section 1.2(c) of the Depository and Disbursement Agreement. *See* Defendant's App. 3, 372 & Defendant's App. II 9.

B.    *The Filing of the Action in State Court, and the Subsequent Bankruptcy Case*

21. On December 19, 2008, Panda-Hereford sued the Defendant in a Texas state court for breach of contract and declaratory relief based upon the Defendant's refusal to fund

Panda-Hereford's Tranche B borrowing requests (including the September 4th Draw Request and the November 21st Draw Request).[15]  *See* DE # 1 in the Action.  The Panda-Hereford petition argues that, although Panda-Hereford was technically in default under the terms of the Financing Agreement when the September 4th Draw Request and the November 21st Draw Request were made, the Defendant was still obligated to fund its *pro rata* share of the draw requests, based upon the execution of the September 5th Waiver and the October 6th Waiver by Panda-Hereford, Société Générale, and a majority of the Lenders who were party to the funding transaction (*i.e.,* Majority Lenders).  Under the breach of contract claim, Plaintiff seeks damages in the form of closing and commitment fees that the Defendant has received over the course of the financing transaction plus attorney's fees.[16]

22.  On January 7, 2009, the Defendant responded in the Action by filing an Answer and Counterclaim.  *Id.*  In the Counterclaim, the Defendant requested a declaration from the state court that the Defendant was acting within its rights under the terms of the Financing Agreement when it refused to advance loan proceeds to Panda-Hereford in response to the draw requests it received.  The Defendant also sought a declaration stating that the September

---

[15]Panda-Hereford actually made three total draw requests for funding under the Tranche B Loan under the Financing Agreement.  The most recent of these was made on December 18, 2008 and was pending at the time the Action was filed in State Court.  The Defendant has never loaned a single dollar to Panda-Hereford, despite having been paid more than $138,000 in commitment fees in connection with the Financing Agreement.  *See* DE # 1, p. 17 (para.14) & DE # 60, p. 2 (para. 14).

[16]Panda-Hereford also sought a declaratory judgment that the October 6th Waiver was effective.  However, it appears that such a finding would be subsumed in Panda-Hereford's breach of contract claim.

5th Waiver and the October 6th Waiver (collectively, the "Waivers") entered into between Panda-Hereford, Société Générale, and the Majority Lenders were ineffective as modifications of the Defendant's rights under the Financing Agreement, due to the fact that the execution of the Waivers effected the interest rate of the Loans, thereby requiring the consent of **all** the Lenders who were a part of the loan transaction. Because the Defendant never signed the Waivers, the Defendant asserts that the Waivers were not effective and that the Defendant was not required to provide any funding to Panda-Hereford, since Panda-Hereford was technically in default under the Financing Agreement.

23. On January 23, 2009, Panda-Hereford (and certain affiliates) filed chapter 11 in the Northern District of Texas (the "Bankruptcy Case").[17] On February 6, 2009, Panda-Hereford removed the Action, thereby commencing the above-referenced adversary proceeding.

24. On September 22, 2009, the Bankruptcy Case was converted to Chapter 7, and Daniel J. Sherman was appointed as the chapter 7 Trustee (the "Trustee"). On December 21, 2009, the Trustee was substituted into the Action for Panda-Hereford and is now the Plaintiff.

25. Eventually, Defendant's MSJ and the Plaintiff's MSJ were filed and orally argued together to the bankruptcy court. The sole issue now to be determined by this Court, in connection with the motions for summary judgment, is ***whether the Waivers were rendered***

---

[17]The debtors in the Bankruptcy Case are Hereford Biofuels, L.P., Hereford Biofuels Holdings, LLC, PHE I, LLC and PHE II, LLC (collectively, the "Debtors").

*"ineffective" and/or unenforceable as to Greenstone, by virtue of the fact that the Waivers contemplated an increase in the interest rate*.

26.  The Defendant argues that, due to the fact that the Waivers directly ***changed the interest rate*** charged on the Loans, the Waivers fell into a category of agreements that, under the terms of the Financing Agreement, required the unanimous approval by ***all*** the Lenders in order to be effective.  Accordingly, the Defendant requests that the Court declare that, as a matter of law:  (i) the Plaintiff should take nothing on its breach of contract claim; (ii) the Waivers were ineffective and not enforceable against the Defendant; and (iii) the Defendant should be awarded its reasonable and necessary attorney's fees incurred in connection with this dispute, in the amount of $161,743.50.

27.  The Plaintiff argues that Panda-Hereford's promise in the September 5th Waiver and the October 6th Waiver to increase the interest rate was simply a unilateral agreement, which would permit the Lenders under the Financing Agreement to increase the interest rate at a later date (if they unanimously agreed to do so), and thus, that the effectiveness of the Waivers was not conditioned upon such increase.  Accordingly, the Plaintiff asks the Court to enter a ***partial*** summary judgment declaring, as a matter of law, that the Waivers were effective and that the Defendant breached its obligations under the Financing Agreement by failing to fund its *pro rata* share of the loans.[18]

---

[18]Greenstone's summary judgment evidence alleges, and is unrefuted, that the interest rate that was charged to Panda-Hereford on its borrowings under the Financing Agreement was increased after the September 5th Waiver by .5% and was increased after the October 6th Waiver by an additional 1.5%.  Defendant's App. II 2.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the Court demonstrate that no genuine issue of material fact exists, and the movant is, thus, entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the nonmovant.  *Piazza's Seafood World, LLC,* 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Material issues are those that could affect the outcome of the action.  *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).  The Court must view all evidence in a light most favorable to the nonmoving party.  *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891.  Factual controversies must be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the movant satisfies its burden, the nonmovant must then come forward with specific evidence to show that there is a genuine issue of fact.  *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir. 1993).  The nonmovant may not merely rely on conclusory allegations or the pleadings.  *Lockett,* 337 F. Supp. 2d at 891. Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment. FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC,* 448 F.3d

at 752; *Lockett,* 337 F. Supp. 2d at 891. Thus, summary judgment is appropriate if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. RULING AND REASONS THEREFORE

A. *Were the Waivers Enforceable as to the Defendant/Greenstone?*

### I. New York Law Is Applicable to the Agreements

Both the Plaintiff and Defendant do not dispute that the Financing Agreement, the September 5th Waiver, and the October 6th Waiver should be construed in accordance with New York law. Like contract law in most jurisdictions, New York law provides that the threshold question in any dispute over the meaning of a contract is whether the contract terms are ambiguous. *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). Whether a contract is ambiguous is a question of law for the Court to decide. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Courts applying New York law have further determined that contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Revson*, 221 F.3d at 66 (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Ambiguous language is language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Revson*, 221 F.3d at 66 (citing

*Seiden*, 959 F.2d at 428). Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate. *Id.* However, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *See Compagnie Financiere de CIC et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (citing *3Com Corp. v. Banco de Brasil*, S.A., 171 F.3d 739, 746-47 (2d Cir. 1999)).

### ii. None of the Agreements in the Case at Bar are Ambiguous

The Court concludes that the Financing Agreement and the Waivers are not ambiguous. The language of these documents is not "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Revson*, 221 F.3d at 66 (citing *Seiden*, 959 F.2d at 428).

First, no one denies that Section 8.5 of the Financing Agreement, entitled "Amendments and Waivers," unambiguously provided: (a) generally, that amendments and waivers were required to be in writing and signed by the Administrative Agent with the consent of merely **the Majority Lenders;** but (b) more specifically, that any amendment or waiver "that could **reasonably be expected** to affect the principal amount, amortization or

maturity of, the interest rate applicable to, or the Collateral securing, the Loans" would not "be effective without the consent of ***all*** of the Lenders." *See* Defendant's App. 79 (emphasis added). Turning to the Waivers, it is clear that they were not simply waivers of default. They accomplished more. They were also agreements that would change the interest rate on the Panda-Hereford Loans (a .5% increase in the interest rate, pursuant to the September 5th Waiver, and a 1.5% increase, pursuant to the October 6th Waiver). This was part of the *quid pro quo* or inducement for the waivers of default. This aspect of the Waivers made the Waivers fall into the category of agreements under the Financing Agreement that required unanimous consent of all Lenders to be effective and enforceable. Because all the Lenders (*i.e.,* Greenstone) did not give consent, the Waivers could not be enforced against Greenstone; thus, Greenstone cannot, as a matter of law, be declared in breach of the Financing Agreement for failure to fund under Tranche B.

The Plaintiff argues that the September 5th Waiver and the October 6th Waiver were themselves effective, but that the provisions in the agreement dealing with an increase in the interest rate were only the borrower's unilateral promise (not a bilateral agreement) because such provisions required going back to the entire Lender group for approval. The Waivers, essentially, merely paved the way for a later amendment that would, hopefully, effectuate a rate increase. The Plaintiff argues that the interest rate aspect of the September 5th Waiver and the October 6th Waiver was not yet effective (but, presumably, all other parts of the Waivers were). This makes no sense. The literal wording of the Waivers belies this interpretation. The Plaintiff's interpretation ignores the simple, straightforward,

nonambiguous way the Waivers were worded. Among other things, the Waivers explicitly stated that their "effectiveness" was contingent on an additional and immediate cash payment to the Majority Lenders of .5% as a so-called "waiver fee" for each Waiver (which the Majority Lenders were paid, eliminating any contingency on their effectiveness). Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. *Hunt Ltd. v. Lefschultz Fast Freight, Inc.*, 889 F.2d 1274, 1272 (2d Cir. 1989). The language in the Waivers quite plainly contemplated that the interest rate increases were to become effective when the Waivers became effective – not later, at some point in time when all Lenders agreed to it. The Plaintiff is wanting the Court to work to save the Waivers with a strained interpretation of the language.[19] Courts should not do that – rather they should simply give contracts their plain meaning.

The Court realizes that there is some irony, for lack of a better term, in this holding. The irony is that if the Waivers had simply been waivers of Panda-Hereford's default (with no "bells and whistles" contemplating a change in interest rate on the Loans), then Greenstone's consent would not have been required for the Waivers to be enforceable and effective as to Greenstone. There is additional irony in that the interest rate change was an *increase* (*i.e.,* favorable to Greenstone and the other Lenders) not a decrease. But this does not matter. The literal wording in the Financing Agreement provided that *all* Lenders were required to unanimously consent to any waiver or amendment that reasonably could be

---

[19]*See* n.18, *supra*.

expected to affect the interest rate on the Loans.  Moreover, the fact that Greenstone would be ***better off*** with an increase in interest rate is not everything it seems at first blush – maybe Greenstone, if consulted, would have determined that the increase in interest rate was not nearly significant enough to compensate a rational lender for the increased risk inherent in loaning the Tranche B funds to Panda-Hereford at a time when it was already in default under the Financing Agreement.  Is this a little bit like letting Greenstone win under the proverbial "loophole?"  Maybe.  But that does not matter.  This is a matter of contract interpretation of a contract involving sophisticated parties.  The contract is not at all ambiguous.[20]

The Court holds that Section 8.5 of the Financing Agreement unambiguously provides that waivers, amendments and consents which might affect the credit terms of the financing required ***unanimous*** consent.  And the Court further holds that the September 5th Waiver and the October 6th Waiver unambiguously "could reasonably be expected" to affect the interest rate applicable to the Loans.

---

[20]In addition to "irony," is there also "injustice" here – in that a Lender who never loaned a dime nevertheless received $138,000 of commitment fees?  Not necessarily. Presumably a commitment fee compensates a lender for committing its capital to one borrower, and thereby foregoing other opportunities to lend.  But a lender only remains committed if the borrower fulfills certain obligations and does not default.  Here, the borrower defaulted.  While the Majority Lenders could waive that default (binding Greenstone), they could not take the additional second step of binding nonconsenting Lenders to a new, different interest rate.  The new, different interest rate may have been better for all the Lenders, but no matter – Greenstone had the ability to say "not good enough" and walk away from the deal.

Having found that the contract is unambiguous, the Court must now give effect to the intent of the parties as revealed by the language they chose. *See Compagnie Financiere*, 232 F.3d at 157. Moreover, the agreement should be read as a whole and the Court should be careful not to distort the document by giving "undue force . . . to single words or phrases." *Williams Press, Inc. v. State*, 335 N.E.2d 299, 302 (N.Y. 1975).

B.     *Is Defendant Entitled to Attorneys' Fees Pursuant to the Terms of the Financing Agreement or Under the Texas Uniform Declaratory Judgment Act or Federal Declaratory Judgment Act?*

The Court, by virtue of the reasoning above, is prepared to declare, as a matter of law, that: (a) the September 5th Waiver and the October 6th Waiver are not enforceable or effective as to Greenstone; and (b) Plaintiff should take nothing on its breach of contract claim against Greenstone, because the Waivers that Greenstone allegedly breached were unenforceable as to Greenstone. However, one more question now remains: is Greenstone entitled to attorneys' fees, as a matter of law, pursuant to Section 37.009 of the Texas Uniform Declaratory Judgments Act, 28 U.S.C. § 2202, and/or Section 8.11 of the Financing Agreement?

Section 8.11 of the Financing Agreement is the beginning and the end of the required analysis. It contains an agreement by Panda-Hereford to pay any Lender's reasonable costs incurred in, among other things, the "enforcement of the Financing Documents or the transactions contemplated thereby or effected pursuant thereto." Section 8.11 goes on to state, at subsection (e) and (e)(ii), that such costs might include:

all reasonable attorneys' fees and expenses and other costs incurred in connection with . . . determining the rights and responsibilities of the any [sic] Agent or the other Senior Secured Parties[21] under the Financing Documents when questioned or otherwise requiring clarification as a result of any action by any Panda Party or any Project Party.

Panda-Hereford, as borrower, is included in the defined term "Panda Party." Panda-Hereford filed this Action, the result of which caused Greenstone (*i.e.,* one of the Senior Secured Parties–*see* footnote 20) to incur attorneys' fees and expenses in connection with this Court's determination of the rights and responsibilities of the parties under the Financing Documents. Thus Greenstone has a right to be reimbursed reasonable attorneys' fees and costs, pursuant to Section 8.11 of the Financing Agreement.

Specifically, the Court determines that there is no genuine issue of any material fact but that Greenstone is entitled to a claim for reimbursement for its reasonable attorneys' fees and costs incurred in this Action, pursuant to Section 8.11 of the Financing Agreement. Section 8.11 is unambiguous. Greenstone has provided evidence that its reasonable fees and expenses incurred in this Action are $161,743.50. *See* Defendant's App. 385-89. The

---

[21]Looking at the defined terms in the Financing Agreement, "Senior Secured Parties" are defined to include "each Lender and each of their respective successors, transferees and assigns." *See* Defendant's App. 122. "Lenders" is defined to include all "Term Lenders." *See* Defendant's App. 113. "Term Lenders" are defined to include "Tranche A Lenders" and the "Tranche B Lenders." *See* Defendant's App. 124. "Tranche B Lenders" is defined to mean each person identified as such on the signature pages of the Financing Agreement and Greenstone was so-identified. *See* Defendant's App. 125 & 92. Thus, if there was any doubt whether Greenstone should be considered a "Senior Secured Party," since Greenstone ultimately did not loan funds under the Financing Agreement, such doubt is resolved by these defined terms; Greenstone is, without a doubt, a defined party entitled to attorney's fees in certain circumstances under the Financing Agreement.

Plaintiff has put forth no summary judgment evidence refuting the reasonableness or actual incurrence or necessity of these fees and expenses. Factual controversies must be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the movant satisfies its burden, the nonmovant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir. 1993). The nonmovant may not merely rely on conclusory allegations or the pleadings. *Lockett,* 337 F. Supp. 2d at 891. Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment. FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Summary judgment is appropriate if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Here, Greenstone is entitled to a conclusion as a matter of law that its attorneys' fees were reasonable and necessary. Plaintiff has put forth no contradictory evidence to show that the fees were not reasonable or necessary. Thus, Greenstone is entitled to recover its fees as a matter of law. Greenstone's claim for its fees and expenses in the amount of $161,743.50 should be an allowed general unsecured claim in the Bankruptcy Case.

## V. CONCLUSION

For all of the foregoing reasons, the Court concludes that summary judgment should be granted entirely in favor of the Defendant, specifically: (a) that it was acting within the scope of its contractual rights when it refused to advance loan proceeds to Panda-Hereford pursuant to the September 4th Draw Request and the November 21st Draw Request, which were made at a time when Panda-Hereford could not satisfy the contractual conditions that were required to be met in order to receive a disbursement of loan proceeds; (b) that the September 5th Waiver and the October 6th Waiver, as to Panda-Hereford's defaults, were not enforceable as to Defendant because such Waivers were not mere waivers of default but also contemplated interest rate increases and any agreement that contemplated interest rate changes needed full-Lender consent (which the Defendant never gave); and (c) that Greenstone should have an allowed, unsecured claim in the bankruptcy case for its reasonable and necessary attorneys' fees and expenses in the amount of $161,743.50 in having to litigate these matters.

### III. CONCLUSION

The Court withdraws the reference in this case and adopts Judge Jernigan's proposed memorandum opinion and order, as modified. The Court concurs with Judge Jernigan's findings and her assessment of the merits. Accordingly, the Court grants summary judgment in favor of the Defendants.

Signed May 24, 2011.

David C. Godbey
United States District Judge